(December 1, 1902.)

## PELIKAN v. RIDPATH.
[71 Pac. 125.]

ALLEGATIONS OF COMPLAINT—EVIDENCE.—Where the evidence fails to establish the material allegations of the complaint, the judgment will be reversed.

(Syllabus by the court.)

APPEAL from District Court, Idaho County.

The facts are fully stated in the opinion.

Fogg & Nugent, for Appellants.

The first five specifications of particulars wherein the evidence is insufficient, briefly stated, are as follows: 1. No evidence of employment; 2. No request to perform service; 3. No knowledge by defendants that services were being performed in their behalf; 4. No knowledge by defendants that plaintiff was working for them in a particular employment for which he claimed wages; 5. No evidence that the defendants received any benefit. To authorize compensation in the nature of *quantum meruit* there must be some proof of the reasonable value of the services rendered. (*McColley v. Brabo,* 33 Fed. 884.) This court has decided where the evidence relied upon to contradict the direct and positive testimony of the appellants' witnesses consisted entirely of the defendants' testimony and wherein defendants' testimony was unsatisfactory, and, as in this case, the respondent denied the conversation upon which the contract was founded only by the equivocal statements that he didn't remember, that there was no substantial conflict of the evidence and that the evidence being clearly against the verdict, the verdict should be reversed. (*Idaho Mrcantile Co. v. Kalanquin,* ante, p. 101, 66 Pac. 933.) When upon the whole evidence the verdict may be seen to be plainly unreasonable and unjust it should be set aside. (*Metropolitan R. R. Co. v. Moore,* 121 U. S. 558, 7 Sup. Ct. Rep. 1334, 30 L. ed. 1025; *Smith v. Belshaw,* 89 Cal. 430, 26 Pac. 834; *In re Irvine's Estate,* 102 Cal. 606, 36 Pac. 1013; *Branson v. Caruthers,* 49 Cal. 374; *Mattock v. Goughnour,* 11 Mont. 265, 28 Pac. 301; *Fuller v. Northern Pacific R. R.,* 2 N. Dak. 252, 50 N. W. 359.)

J. F. Ailshie, for Respondent.

"If the facts alleged in the complaint are presumptively within the knowledge of defendant he must answer positively, and a denial upon information and belief will be treated as an evasion." (*Curtis v. Richards & Vantine,* 9 Cal. 38; *Humphreys v. McCall,* 9 Cal. 59, 70 Am. Dec. 621, and note; *Loveland v. Garner,* 74 Cal. 298, 15 Pac. 844; *Swanholm v. Resser,* 3 Idaho, 476, 31 Pac. 804.) Where the facts are in dispute, or are involved in doubt, so that different men might honestly arrive

at different conclusions from the same evidence, the decision of the questions thus presented belongs exclusively to the jury. (*Colorado Coal etc. Co. v. John,* 5 Colo. App. 213, 38 Pac. 399; Abbott's Civil Trial Brief, 387; *Ainslie v. Printing Co.,* 1 Idaho, 643; *Chamberlain v. Woodin,* 2 Idaho, 642, 23 Pac. 177; *O'Connor v. Langdon,* 3 Idaho, 61, 26 Pac. 659; *Van Buren v. McKinley,* ante, p. 93, 66 Pac. 936; *Idaho Mercantile Co. v. Kalanquin,* ante p. 101, 66 Pac. 933.)

SULLIVAN, J.—This is an action to recover the sum of $1,300 from the defendants, who are appellants here, on account of labor and services alleged to have been rendered for the defendants, as copartners, at their special instance and request, by the respondent, as a brewer, for a period of fifty-two weeks, commencing October 1, 1899, and ending October 1, 1900, which services are alleged to be of the reasonable value of twenty-five dollars per week. The amended answer puts in issue the material allegations of the complaint. The cause was tried by the court with a jury, and verdict and judgment were given and entered in favor of the respondent for the amount claimed in the complaint. A motion for a new trial was denied, and this appeal is from the judgment and order overruling that motion. Numerous errors are assigned, on which a reversal of the judgment is asked.

I gather the following facts from the record: Some time in the spring of 1899, the defendants, who were residents of Spokane, state of Washington, at the solicitation of the plaintiff and one Rudersdorf furnished certain money for the purpose of building a brewery at Grangeville, Idaho. After making the arrangement to erect said brewery, said Rudersdorf and respondent, Pelikan, went to Grangeville, and proceeded to purchase land and erect a brewery thereon, and run the same until about the month of August, 1899. Said business has been very poorly managed, and accumulated an indebtedness of several thousand dollars. Such was the condition when C. B. Dunning, Esq., an attorney at law of Spokane, Washington, went to Grangeville, as attorney for the appellants, Ridpath

& Harris, to look into the business and adjust the indebtedness. When he arrived there he found the indebtedness much larger than he expected to find it, and informed the parties that they could go no further until he reported to Ridpath & Harris, and then and there closed down the brewery. The respondent said he thought, if he could run it, he could make some money— either buy it or lease it; and Dunning replied that if that was his opinion to go back with him to Spokane. He did go to Spokane, and there had a conference with appellant Ridpath. Respondent testified that he went to Spokane at the time referred to on his own account, and. on his arrival there, went to Ridpath's office to settle up with them, and to report how things were going on, and to see how things would go further. He testified, in part, as follows: "I made a settlement of my own salary as well as other things. . . . . There was nothing said about salary, only I wanted money. . . . . I don't remember that Mr. Ridpath told me that the brewery could never be opened on his behalf again, or that he wouldn't be responsible for a single dollar, or have the brewery run under his name or under his direction, nor that I made arrangements to go back and run the brewery on my own behalf. I don't remember that Mr. Ridpath mentioned that. . . . . Neither Mr. Harris nor Mr. Ridpath told me to go back to the brewery and go to work at any time after I came to Spokane." It appears that Ridpath gave Mr. Dunning $300 for the purpose of paying some debts, and he gave it to respondent; and at that time, respondent testified, Dunning told him to go back and go to work. The evidence is undisputed, except as to time, that Ridpath & Harris entered into a contract with appellant to sell him said brewery. The appellants claim, and show by an overwhelming preponderance of evidence: That the arrangement or contract of sale was talked over while the appellant was in Spokane, the latter part of September, 1899. That at that time, in the conversation above referred to, the appellant Ridpath, respondent Pelikan, and a Mr. Dunning being present, Mr. Pelikan said that he thought the man who would run it (brewery) economically could make some money; that he had worked there

six months, and had had no money, except some groceries and some things to live on, and that rightfully he ought to have about $600; that if they would pay him that sum, and sell him the brewery on easy payments, he could buy barley with the $600 during the winter, and get ready for the spring trade, and could buy the brewery and meet his obligations. Respondent said that he had a friend who had some money that he could get; that, if they would figure up the entire cost of the brewery—the money that had been paid out—he would take it, and pay $3,000 on the 1st of August, 1900, and the balance in $1,500 yearly payments. Appellant Ridpath replied that would suit him; that he (respondent) could have all the time asked for, and that, so far as he was concerned, he did not propose to have anything more to do with the running of the brewery in any shape or form, or assume any possible liability in any way; that he had had enough of that, but was perfectly willing to sell to respondent, and give him liberal terms. Respondent replied that those terms would suit him. Thereupon the respondent said that John B. Hess, of Spokane, was his attorney, and that he would see him and instruct him to prepare the contract, or "to go on with this," and that, as he (respondent) was in a hurry to get back to Grangeville, he would leave those matters with Mr. Hess to act on respondent's part. Appellant Ridpath replied that he would leave the matter, on his part, with Mr. Dunning, and that Dunning would see Hess, and that Hess and Dunning would draw the contract for the sale of the brewery. The record shows that Dunning made notes of the contract, and not later than the next day he went to the office of Hess, and there the contract was drawn up and signed by Ridpath & Harris, and let in the hands of Hess, respondent's attorney. In that conference, Mr. Ridpath informed the respondent that under no consideration would he allow any person to open said brewery under his name, or to place him in a position where he would be under any obligation for the debts, or any liability whatever. It is further shown that, some two months or more after the contract was drawn, Mr. Hess came to Mr. Dunning, and said that the contract which was

first written had become dirty or mutilated, or something had happened to it, and that he had made another copy, and put in a different month from that in the original contract. He presented them both, and said that he had been conferring with Pelikan, and everything was all right. The contract was signed and acknowledged. In pursuance of said agreement, the appellants in the latter part of January, 1900, sent the respondent a statement of the investments made by them in said brewery, which statement shows that they had invested a total of $9,481.56; also a statement showing bills due and payable by the Grangeville Brewing and Malting Company, which shows a total of $1,467.10 and more than half of that was due to foreign creditors. The contract referred to is contained in the record, and the respondent testified that he directed Hess, as his attorney, to prepare a contract for the sale of the brewery; that he notified him by mail to do that sometime in November; that he does not remember saying anything to him about the matter in September. The contract was either in the hands of the respondent, or in the hands of his said attorney, from the time it was drawn up to about the time this cause was tried in the district court. On January 22, 1900, the respondent wrote a letter to C. B. Dunning, Esq., attorney for the appellants, in which, among other things, he wrote; "I have made no debts on the company's account. Everything I have contracted for is in my own name." On the 9th of May, 1900, the respondent wrote the following letter to appellant Harris: "Col. Wm. Ridpath. W. H. Harris. J. E. Rudersdorf. Joseph Pelikan. Office of Grangeville Brewing and Malting Co. Grangeville, Idaho, May 9, 1900. W. J. Harris, Spokane: I have to state to you that the party spoken of about to purchase the brewery has backed out, influenced by a certain hotel-keeper in town. This, of course, will let me out. Now, I notify you that you can have your place on the 1st of August, or any time before, if you have somebody to run it. I am getting tired of being boycotted by people for the fault of others. If you would have done as I suggested in the start—pay up all indebtedness —this would not have happened. Yours truly, Joseph Pelikan."

This action is based on the contract or agreement made between the parties in September, 1899, at Spokane, Washington. It is a suit on an express contract for services rendered, as stated in the complaint, at the special instance and request of appellants. There is no evidence whatever in the record to sustain the material allegations of the complaint. If we rest the case on the testimony of respondent, and that introduced by him, including the letters written by him, such evidence utterly fails to prove the allegations of the complaint; and there is no substantial conflict in the evidence upon the point that he took possession of said brewery and operated it from October 1, 1899, to at least the 9th of May, 1900, as a prospective purchaser under the terms of said written contract. That contract contains, *inter alia,* the following provision: "In case the second party [respondent] should conduct and carry on and run the brewery on said premises, he is to do so at his risk and expense, and the first parties shall not be liable for any debts or demands contracted by said second party in reference to said brewery business." The letter of January 24, 1900, above quoted from, informs the attorney for appellants that he has made no debts on the company's account, and had contracted for everything in his own name—shows that he was at that time carrying out the above-quoted provision of the contract; and the letter of May 9, 1900, above quoted, notified the appellants that the party respondent had expected to get money from had backed out, influenced by a hotel-keeper, and that that would let him out, and that appellants could have possession of the brewery on the 1st of August, 1900, or at any time before, if they had somebody to run it. If he was in their employ, and they had hired him to run it, as he claims in this action, why did he write that letter? Why notify them that they could have possession on August 1st, if they had possession all the time? When on the witness-stand, he tried to explain one of said letters; and his explanation does not explain, but only shows that he was attempting to quibble and evade the effects of his plainly written letter. While it is true the letter of May 9, 1900, was excluded on a mere technicality, it was reversible

error to exclude it. It had been identified, and by an oversight of the attorney it was not offered when he was putting in the appellants' evidence in chief. Such technicality will not be permitted to defeat justice.

The respondent testified that he did not sign said contract because the appellants failed to pay up the indebtedness of said brewery business that had accrued under the extravagant management of Rudersdorf. He and his attorney had possession of the contract from the time it was executed by appellants up to May 9, 1900, and long after that time; and there is no evidence in the record to show that respondent did not intend to purchase said brewery under its terms until that date, when he notified them by letter that they could have possession of the brewery on August 1, 1900. And in order to evade the consequence of his acts, and recover on a contract of hire, respondent attempted to show that the alleged agreement to pay up all of said debts was made at the time said written contract was made, and that they failed to pay said debts. As the alleged contract to pay off said debts was contemporaneous with the written agreement, and a part of it, according to the testimony of respondent, had that been true it should have been incorporated in the written agreement. In said last-mentioned letter, respondent wrote to appellant Harris that if he had "done as I suggested in the start—pay up all indebtedness—this would not have happened." Respondent, in that letter, did not charge appellants with not keeping their contract, in not paying off said debts, but that if they had paid them, as he (respondent) had "suggested," it would have been all right. It is not shown that any of said debts were liens on said brewery property, but respondent claims that the brewery was "boycotted" because of such debts. The whole record shows that the respondent has utterly failed to prove the allegations of his complaint, and that, if he has any cause of action against appellants, it is for damages because of their failure to keep and perform their part of said contract, and not the cause of action alleged in the complaint, for services rendered. That being true, it is not necessary for us to pass upon the many assignments of error contained in the record.

The judgment is reversed, and the cause remanded for further proceedings in accordance with the views expressed herein. Costs are awarded to appellants.

Quarles, C. J., and Stockslager, J., concur.

#### ON REHEARING.

Per CURIAM.—We have carefully considered the petition for a rehearing herein, and find nothing, either in the way of authority or argument, which was not fully considered at the original hearing. There is nothing in the petition for a rehearing that induces us to think that the conclusions reached are erroneous, wherefore a rehearing is denied.